Filed 1/25/23  Conservatorship of D.B. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| Conservatorship of the Person of D.B. | |
| CONTRA COSTA COUNTY HEALTH SERVICES, <br><br>     Petitioner and Respondent, <br><br> v. <br><br> D.B., <br><br>     Objector and Appellant. | A164706 <br><br> (Contra Costa County <br>     Super. Ct. No. MSP21-01855) |

The Contra Costa Public Conservator petitioned under the provisions of the Lanterman-Petris-Short Act (Welf. & Inst. Code, § 5000 et seq.)[1] for appointment as conservator of the person of appellant D.B.  The petition alleged D.B. was gravely disabled due to a mental disorder, unable to provide for his basic needs for food, clothing, or shelter, and incapable of accepting treatment voluntarily.  After a February 2022 hearing, the court granted the petition for an initial one-year term.

D.B.'s sole contention on appeal is that the grave disability finding must be reversed because the trial court prejudicially erred in admitting into

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

evidence certain entries in his medical records that he claims are inadmissible hearsay.

We affirm.

BACKGROUND

The Public Guardian of Contra Costa County (Public Guardian) filed a petition to conserve D.B. in December 2021. The trial court appointed the Public Guardian as D.B.'s temporary conservator that day and empowered the Public Guardian to place D.B. in a locked facility and to make medication and treatment decisions on his behalf.

At the trial, two months later, D.B. and clinical psychologist Jennifer Weinstein testified.

Dr. Weinstein testified as an expert "in the area[] of psychology, as well as in the area[] of determining grave disability." She stated, in evaluating patients for a grave disability, she will "do a review" of the records and also "go in to interview the patient." In this case, she interviewed D.B. for 40 minutes, reviewed his medical records from the Contra Costa Regional Medical Center, and spoke to D.B.'s social worker.

Dr. Weinstein diagnosed D.B. with schizophrenia. She explained, a "diagnosis of schizophrenia means that one exhibits symptoms from a list of symptoms, . . . one of which must include [either] delusions or hallucinations. [¶] So the first symptom is hallucinations, then delusions, . . . thought disorganization, negative symptoms. Hallucinations include auditory or visual—auditory/visual, most often auditory . . . come in the form of hearing voices." Negative symptoms included, "poor upkeep of activities of daily living, such as poor hygiene, social problems or difficulties . . . , lack of motivation to proceed in activities, lack of appropriate emotional expression." Schizophrenia is a "chronic disorder" which varies per individual and can

2

vary over time, but the disorder can be managed with psychiatric medications, structured treatment, therapy, day-to-day life assistance, and maintaining sobriety and a healthy lifestyle.

After county counsel asked about D.B.'s current psychological or psychiatric medication, Dr. Weinstein confirmed she had reviewed D.B.'s medical records, which included medication information. D.B.'s counsel objected to any answer on "hearsay and foundation" grounds and also noted the records were not in evidence.

The court overruled the objection, and county counsel moved to admit the records "under Evidence Code section 1271, along with a declaration compliant with Evidence Code section 1561." D.B.'s counsel continued to object, asserting "there are several portions within the document that are inadmissible on hearsay and foundation bases." The court allowed the records, stating "[o]ne, attached to the very front of the packet is the declaration of the custodian of medical records which comports to Evidence Code section 1562," and two, it "comports with the requirements of [Evidence Code section] 1271 . . . because there may be hearsay or *Sanchez*-related[2] objectionable items inside, the Court will not, as a whole, review [the exhibit] but only the excerpts . . . that the Court allows in."

Dr. Weinstein then testified D.B. was taking two antipsychotics, which can "reduce symptoms of schizophrenia."

County counsel next asked Dr. Weinstein about her interview with D.B. Dr. Weinstein explained that during the interview, D.B. was oriented as to where he was but thought he "owned the building, the hospital building that he lives in, and that it was his house." D.B. was "quite . . . confused and

---

2 *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

3

paranoid about how he came to be involuntarily detained." For instance, he told Dr. Weinstein that he had been "abducted by the police because his family made fake allegations about his behavior." When Dr. Weinstein asked D.B. "how he came to be at the hospital," D.B. maintained he "very recently came to this earth as a reincarnation after being eaten by a giant rat, that he—he came from a combustion and he is God." He then "went on to describe interdimentional [*sic*] travel, time travel, that he—he came on out on the other side . . . that he disappeared suddenly and then came out on the other side in Concord, California, after being eaten by a giant rat" but stated he was actually from a place called "Zaloomba." D.B. sounded "delusional, confused, disorganized," and "grandiose[e]" during the interview. All of which are "symptoms of schizophrenia."

Additionally, during the interview, Dr. Weinstein observed that D.B. was "paranoid." For example, he described that he was being "treated or abused at the facility he's at or that doctors are creating a treatment plan for him based on their own desires and that their treatment is actually for another [D.B.]" D.B. also told Dr. Weinstein he had been "murdered at the hospital and then came back to life." D.B. did not believe he had a "mental health diagnosis" and thought he was "God." He also experienced "thought-broadcasting" during the interview, when he "believed that the TV [was] talking to him, the CBS network is speaking directly to him when he watches that TV network."

When Dr. Weinstein asked about his plans for food, clothing and shelter, D.B. informed her he "would walk to a hotel in Concord or Pittsburg and stay in a hotel . . . until . . . his name comes up on the Section 8 housing list," because "he can't go—he doesn't think he can go near [his grandmother]." He explained that his grandmother, with whom he had

4

previously lived, "is a henchman and she's in cahoots with . . . the police, trying to . . . get him detained."

Dr. Weinstein then returned to discussing D.B.'s current medications and generally how medications like the ones D.B. was currently taking may affect the person who takes them. D.B., for his part, could only tell Dr. Weinstein the name of one of his current medications but was of the opinion "he does not need the medication" and stated he would not take medication "if he were on his own."

When Dr. Weinstein asked D.B. about seeking assistance if he needed it in the future, D.B. stated he had previously "worked with the Hume Center" but that he "believed that they put AIDS in him," and so he could no longer work with that organization.

County counsel then asked Dr. Weinstein about specific entries in D.B.'s medical records. The court allowed Dr. Weinstein to testify, over counsel's objection,[3] about the entries in the records on which she based her opinion, but not about diagnoses set forth in the records.

The first record entry, from April 6, 2021, indicated D.B. had been admitted on March 4 "on 5150 in four-point restraints." He was "[m]alodorous," had "paper in his ears," and "[p]rominently thought-blocked on interview." D.B. denied all psychiatric symptoms and past diagnoses but then maintained he had been taking " 'all the medications prescribed,' " though he could not recall any names. County counsel asked Dr. Weinstein how that portion of D.B.'s medical record informed her "opinion as to [D.B.'s] psychiatric diagnosis and whether or not he's gravely disabled?"

_____

[3] Unless otherwise noted, D.B.'s counsel objected on foundation and hearsay grounds.

5

After the court overruled an objection, Dr. Weinstein answered, "Well, given that the diagnosis needs to be—the symptoms have to have occurred over a period of time, and this is back in March and the presentation is similar . . . to the symptoms and presentation that I—that I used to give the diagnosis of schizophrenia upon my interview."

Next, county counsel directed Dr. Weinstein to an April 2021 discharge summary and a November 27, 2021, admission summary. These records stated D.B. had been released from his prior admission in April "with medications" but was readmitted on November 8, and as of November 27, he was refusing to have his blood drawn and had "demonstrated continued delusional beliefs and illogical thinking." County counsel again asked Dr. Weinstein how this informed her "opinion with regard to [D.B.'s] ability to function in the community without a conservatorship?"

D.B.'s counsel once again objected stating, "I think part of the problem is that we're talking about two separate entries in the single question, but as to the initial entry of there was information stated to [D.B.] upon discharge, I'm not objecting to that; I think that's pretty clear a statement made by the facility and it's captured there in the business record, but the second portion is a statement that's incorporated later in time; this is now at least including up to January 18th the author's writing this and describing something that happened back in November, so there's several stages of information that came there, plus the foundation for Clozaril being initiated on November 27th, how that came to the author's knowledge and was that at the facility? [¶] Also, the description of his refusing to have blood drawn, delusional beliefs, illogical thinking, those are general descriptions . . . there's not reference to statements from him or the foundation for that." County counsel replied, "these are all notes made during [D.B.'s] time at [Contra Costa

6

Regional Medical Center], clearly by staff as they are observations of his behavior and of choices with regard to medications; they all fall under *Conservatorship of SA*[4] as reliable statements by medical professionals in a medical business record."  The court ruled, "I will allow everything except the reference to delusional beliefs; there could be some form of diagnoses in there, but everything else will remain."

County counsel then asked what, if anything, the April discharge note told her about D.B.'s "ability to provide food, clothing, and shelter for himself unassisted, in the community?"  Dr. Weinstein replied, "It demonstrates his inability to do so."  The court then interrupted to clarify that it would "further find on just that ruling I made previously that the contents that the Court is allowing in appear to be made by staff or medical person observations.  The Court is disallowing the reference to any diagnoses.  And the Court will find they are coming in because the Court considers them reliable and trustworthy pursuant to Evidence Code section 1271."

County counsel then pointed Dr. Weinstein to, within those same April and November entries, statements that D.B. "refused to take" his medication, "[d]espite multiple attempts to convince patient."  Counsel asked how, if at all, D.B.'s refusals affected Dr. Weinstein's opinion about whether D.B. "would take . . . medications unassisted in the community?"

D.B.'s counsel once again objected, and the court once again overruled the objection stating, "the Court will find that it appears that these entries are made by staff or medical people that are observing.  The Court will not be admitting any diagnoses, and the Court will find these reliable, at least as far

---

[4] *Conservatorship of S.A.* (2018) 25 Cal.App.5th 438 (*S.A.*).

7

as they were read, purport to Evidence Code 1271, and therefore, they are trustworthy."

Dr. Weinstein then answered that these entries revealed D.B.'s "ambivalence regarding medication and . . . his potential difficulty with taking medication unassisted without . . . [a] highly structed medical facility."

County counsel next asked about entries dated December 28 and 29, 2021. The first stated D.B. "Discontinued clozapine at patient refusal for blood draws and willingness to take medications." The second stated, "Significantly more psychotic since stopping clozapine." D.B.'s counsel objected to both statements.

The court overruled counsel's objection as to the first statement, and after asking counsel to lay foundation, overruled the objection as to the second statement as well.[5]

County counsel proceeded to ask Dr. Weinstein, what if anything, those two entries told her about D.B.'s "ability to get food, clothing, or shelter for himself should he stoop [*sic*] taking medication in the community?" Dr. Weinstein responded, "these two notes reveal that the propensity of . . . [D.B.] to decline medication that the providers prescribed as it appears to be helpful in reducing symptoms and it supports the concern that he has a propensity for deteriorating further in the community off medication on his own."

County counsel moved onto a January 7, 2022, entry which stated, "Patient is guarded. No insight. Interrupted author during medication

---

[5] The court sustained an objection to two other notes in the December 29 entry which stated, "Patient is clearly more psychotic today than yesterday" and "It appears he was responding to internal stimuli" because these appeared to be a "clinical impression" rather than just "clear statements of behavior."

teaching, quote, 'Stop talking to me like I'm schizophrenic. I don't have schizophrenia.'" D.B.'s counsel objected to the statements "Patient is guarded." And "No insight." The court overruled the objection as to "guarded" but sustained the objection as to "insight." Dr. Weinstein then stated that entry was "consistent with [her] evaluation and . . . interview. [D.B.] does not believe that he has this mental illness that doctors have diagnosed him with."

Finally, county counsel directed Dr. Weinstein to a January 12, 2022, entry which stated "However, when attempted to discuss medication, patient became upset, saying, quote, 'I don't need any medication because I am God,' end quote, then walked away." Dr. Weinstein opined this entry showed D.B. "has a grandiose belief of who he is that's bizarre in the sense of far from reality, and the belief supports or is—coincides with his lack of medication compliance, the lack of insight into the mental illness, the lack of insight into the need for medication."

After counsel objected, the court overruled the objection stating "It goes to the weight, not the admissibility. Cross-examination would be allowed."

Dr. Weinstein went on to explain that her diagnosis of schizophrenia was based on D.B.'s "exhibiting of these symptoms over time, over a period of time, including symptoms that three or more meet [the] criteria for the diagnosis of schizophrenia, which are delusions; false, bizarre beliefs are delusions, . . . disorganized thinking and negative symptoms are three of the symptoms . . . I observed and also that were supported by records." She opined D.B. was gravely disabled based on (1) his lack of insight into his diagnosis because he stated on "multiple occasions that he does not have this diagnosis," (2) his refusal to take medication and that given what D.B. had told her during her interview, she thought it "highly unlikely" he would

9

continue to take his medication if released; and (3) his mental disorder affected his ability to provide for his basic needs because his "thought disturbances interfere with coherent or linear thinking and also . . . with his ability to create an orderly or linear plan, a discharge plan with consistent follow-through of the steps of said plan."

When D.B. testified, he first read from a prepared statement that, while at the hospital, clinicians and doctors talked "about killing me in groups, and they expect me to sit in with the hate." The staff kept "talking about me being kidnapped, and they say they need ransom." When asked about his "position on taking medication," D.B. stated he is "not the same [D.B.] that was first admitted to this hospital. I came from the ruler. I know they talked about a little bit on Tuesday, but I came from the ruler. I was a cartoon. I was not a regular human. And I came from San Leandro. That's where I was picked up from, but I was combustible, and I combusted in that county—I mean, in that city." He explained, when asked how he would make plans for shelter, food, and clothing, that he would need his funds first, "but after I get my funds, I would have no problem with making any arrangement I need to" and that he "could get food and clothing easily by going to the store."

Finally, when asked to state his position on whether he had a mental health disorder, D.B. stated "My take on this is the world is getting so vague with the responses to line our mental aphasia, and they are not accepting what their mind has come to, and so it's like—so I'm seeing everyone's head chiming, and I know that it's not a normal thing, but no one acknowledges it. So, it's just going on as long as whoever can keep it going. I don't think I need any medication for something that is a nuisance to anybody who is experiencing it because it's just a diagnosis. It's not a fair diagnosis."

10

On cross-examination, D.B. further explained he did not believe he had schizophrenia. When county counsel asked if he would take his medication if released from the hospital, D.B. stated, "If that was to come, I would have to take that medicine. But if I can get this to be seen in the light that I'm trying to have it seen in, I wouldn't need medication."

The court found beyond a reasonable doubt that D.B. was gravely disabled and his current placement was appropriate. The court found by clear and convincing evidence that four disabilities should be imposed—as to his right to refuse treatment related to his grave disability, to drive a vehicle, to enter into contracts, and to possess or own a firearm or other deadly weapon.

A month after the hearing, the court issued a letter of conservatorship and an order appointing a conservator of the person of D.B. for a one-year period commencing February 17.

## DISCUSSION

"The Lanterman-Petris Act . . . section 5000 et seq., governs involuntary treatment of the mentally ill in California. Under the Act, 'A conservator of the person, of the estate, or of the person and the estate may be appointed for any person who is gravely disabled as a result of mental [health] disorder. . . .' (§ 5350.) 'Gravely disabled' is defined. It means, 'A condition in which a person, as a result of a mental [health] disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter. . .' (§ 5008, subd. (h)) with the additional proviso that 'a person is not "gravely disabled" if that person can survive safely without involuntary detention with the help of responsible family, friends, or others who are both willing and able to help provide for the person's basic personal needs for food,

11

clothing, or shelter' (§ 5350, subd. (e)(1))." (*Conservatorship of George H.* (2008) 169 Cal.App.4th 157, 159–160.)

Section 5008.2, subdivision (a) provides, in relevant part, "[T]he historical course of the person's mental disorder, as determined by available relevant information about the course of the person's mental disorder, shall be considered when it has a direct bearing on the determination of whether the person is a danger to others, or to himself or herself, or is gravely disabled, as a result of a mental disorder. The historical course shall include, but is not limited to, evidence presented by persons who have provided, or are providing, mental health or related support services to the patient, . . . including psychiatric records, or evidence voluntarily presented by family members, the patient, or any other person designated by the patient."

D.B. nevertheless asserts the trial court prejudicially erred in allowing various medical records into evidence, relying on *Sanchez*, *supra*, 63 Cal.4th 665.

In *Sanchez*, our Supreme Court held "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth." (*Sanchez, supra*, 63 Cal.4th at p. 686 & fn. 13.) "Case-specific facts are those relating to the particular events and participants alleged to have been involved in the case being tried." (*Id.* at p. 676.) Such statements may not be related by an expert as true "unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at p. 686.) Moreover, "multiple levels of hearsay must each fall within an applicable hearsay exception." (*Id.* at p. 684, fn. 11.) However, the high court also affirmed that an expert may

12

"testify about more generalized information to help jurors understand the significance of those case-specific facts" and may "give an opinion about what those facts may mean." (*Id.* at p. 676.)

In *S.A., supra*, 25 Cal.App.5th 438, the appellate court discussed the application of *Sanchez* to mental health records admitted in conservatorship proceedings. (*Id.* at pp. 447–448.) The court explained that the business records exception to the hearsay rule "requires a foundational showing that (1) the writing was made in the regular course of business; (2) at or near the time of the act, condition or event; (3) the custodian or other qualified witness testifies to its identity and mode of preparation; and (4) the sources of information and mode and method and time of preparation indicate trustworthiness." (*Id.* at p. 447; see Evid. Code, § 1271.) "These requirements may be satisfied by affidavit." (*S.A.*, at p. 447; see Evid. Code, § 1561.) Moreover, "[t]he trial court has wide discretion to determine whether there is a sufficient foundation to qualify evidence as a business record; we will overturn its decision to admit such records only upon a clear showing of abuse." (*S.A.*, at p. 447.)

In *S.A.*, the court held "S.A.'s medical records, as redacted were admissible under the business records exception to prove the acts, conditions, and events recorded therein." (*S.A., supra*, 25 Cal.App.5th at p. 447.) In so holding, the court rejected the argument that records failing to state the recorder was the direct observer of the act in question lacked adequate foundation. It pointed to the trial court's comments that the "records were 'clearly the reports of persons and staff, licensed psychiatric technicians, . . . who are reporting [S.A.'s] observed conduct' and the board and care facility records were 'obviously the observations . . . of the people in the psychiatric program.' " (*Id.* at p. 448; see *People v. Orey* (2021) 63 Cal.App.5th 529, 551–

13

552 (*Orey*) [trustworthiness in this context "may be established by showing that a written report is based on the observations of a public employee who has a duty to observe the events and to report and record them accurately"].)

Here, D.B. takes no issue with the proposition that the medical records generally fall within the hearsay exception for business records. Rather, he claims that certain entries contained "additional levels of hearsay, for which no exception applied." (Underscoring omitted.)

For instance, he objects to the April 6 entry[6] "regarding [his] initial admission" which "apparently relied on observations and records from another facility, with no indication as to who made or entered such information or why the information was trustworthy." However, the entry—a "Psychiatric Discharge Summary" prepared by Psychiatrist Jonathan Kalkstein, M.D.—consisted of "observations made upon [D.B.'s] arrival" and statements made by D.B. at the psychiatric emergency services facility within Contra Costa Regional Medical Center and which were in a psychiatric intake note. These observations were therefore impressions of D.B.'s conduct and "clearly" made by hospital staff who were reporting his observed conduct and appearance on a specific occasion, and were thus admissible. (See *S.A., supra,* 25 Cal.App.5th at p. 448; see also *Orey, supra*, 63 Cal.App.5th at pp. 551, 554–555 [the business records exception makes admissible that which

---

[6] The April 6 entry—a Psychiatric Discharge Summary—prepared by Psychiatrist Johnathan Kalkstein, contains a "History of Present Illness/Reason for Admission," which states, in relevant part, "Per PES psychiatric intake note: [¶] Arrives on 5150, in 4 pt. restraints. Malodorous, prominently thought blocked on interview. Has paper in his ears but denies all psychiatric sx incl SI/HI/A/VH/PI/OR, denies past diagnoses, says he's been taking 'all the medication prescribed', can't recall any names." (Underscoring omitted.)

14

would be admissible if presented by oral testimony; "[m]atters within the note maker's personal knowledge and the note maker's impressions come with the public records exception or business records exception"].) Additionally, D.B.'s statements come within the party admissions exception to the hearsay rule. (Evid. Code, § 1220; *People v. Yates* (2018) 25 Cal.App.5th 474, 485.)

Next, D.B. contends the November 27 entry[7] "[s]imilarly . . . relied on information and events allegedly occurring months earlier, with no indication as to the specific beliefs by appellant that were allegedly delusional or illogical." However, as to this entry the court specifically excluded "the reference to delusional beliefs" because it appeared to be a diagnosis. D.B. also contends the November 27 and December 28 and 29, and January 12[8]

---

[7] On November 8, D.B. was admitted to the Regional Center. Contained within that admission summary is the subsequent November 27 entry which can be found under the heading "Assessment" and states, "While hospitalized, the patient was treated with Haldol, which was cross-titrated to Abilify. Clozaril was initiated on 11/27/2021 and he has demonstrated some moderate improvement in his mental status. Abilify was re-added to his regimen to target negative symptoms of psychosis. [D.B.] refused to have his blood drawn and he demonstrated continued delusional beliefs and illogical thinking. He refused to take clozapine that unfortunately cannot be given in the form of IM back up. Despite multiple attempts to convince patient he is refusing to consider Clozapine or Abilify."

The December 28 and 29 entries are also found in the November 8 admission notes under the heading "Assessment" and the subheading "Progress Summary." They state, "12/28/21[;] Discontinued clozapine at patient refusal for blood draws and willingness to take medications," and "12/29/21[;] Significantly more psychotic since stopping clozapine."

[8] The January 12 entry, which was prepared by Dr. Shan Elahi, M.D., reads "Patient was cooperative initially during interview. Saying he is feeling fine and spending time writing in his journal. Denied symptoms of psychosis. However, when attempted to discuss medication, patient became

15

entries "regarding [his] medical regimen, and his alleged refusal to take medications . . . failed to describe the nature of or reasons for, or circumstances surrounding [his] refusal, or the specific observations on which the entries were based." These entries were admissible to show D.B.'s refusal to take medication, even though it is not clear the exact circumstances surrounding his refusal. (See *S.A., supra*, 25 Cal.App.5th at p. 448 [such records were " 'clearly' " the reports of technicians and staff who were " 'reporting [S.A.'s] observed conduct' " and were thus admissible under the business records exception].) Moreover, the January 12 entry did describe the circumstances, noting D.B. "became upset" after Dr. Elahi tried to discuss medication with him and D.B. responded, " 'I don't need medication because I am God,' " and walked away.

Finally, D.B. makes no specific argument with respect to the January 7 entry[9] he identified in his briefing. Trial counsel made no objection to defendant's statements in the entry but only to the notes stating (1) he was "guarded," which the trial court admitted as it was "an observation because it reflects the response to questions or comments" and (2) he had "[n]o insight," which the court excluded because it was "closer to [a] diagnosis." The observation that D.B. was "guarded" was admissible. (See *Orey, supra*, 63 Cal.App.5th at pp. 551, 553–554.)

---

upset saying 'I don't need any medication because I am God' then walked away."

[9] The January 7 entry, prepared by Joanny Tran, RN, reads "Note: N: Patient is guarded, no insight, interrupted author during medication teaching 'Stop talking to me like I'm Schizophrenic, I don't have Schizophrenia'. Refused to discuss admission w/author. Randomly visible in unit, journal on hand (observed writing in journal while rapping in the dayroom). Unkempt and malodorous."

In sum, the challenged record entries were properly admitted to prove relevant acts, conditions or events.  They were not hearsay, and Dr. Weinstein properly was allowed to consider them in forming her opinion that D.B. was gravely disabled.

In any event, even assuming the court erred in admitting the challenged portions of the medical records, any error was harmless under either *Chapman v. California* (1967) 386 U.S. 18, 24 or *People v. Watson* (1956) 46 Cal.2d 818, 836, as there was abundant other evidence supporting the finding D.B. was gravely disabled.

Dr. Weinstein's opinion was not based "entirely" or "exclusively" on the medical records as D.B. contends.  Rather, she also based her opinion on her interview with D.B.  As the court noted, in addition to finding Dr. Weinstein "very credible," her diagnosis was based "on [her] recent interview with [D.B.] in person, and there was not a contradicting or . . . another expert introduced to contradict what her expert opinions were."

Indeed, during his interview with Dr. Weinstein, D.B. exhibited several symptoms of schizophrenia including "delusional, confused, disorganized," and "grandiose" thinking as well as paranoia and thought-broadcasting.  (See *Conservatorship of K.W.* (2017) 13 Cal.App.5th 1274, 1286 [expert's testimony not based entirely on reports but also on his own experience, and expert testified "without any contradictory medical opinion, that K.W. met the criteria for grave disability . . . and was unable to care for himself"].)  Dr. Weinstein also observed that D.B. did not have insight into his mental health condition because he told her he did not believe he had any "mental health diagnosis" and he was "in fact, God."  (D.B. said the same thing at the hearing, testifying he did not believe he had schizophrenia.)  D.B. also told Dr. Weinstein he did not think he needed to take medication and he would

17

not take medication "if he were on his own." (He similarly testified at the hearing that he did not think he needed medication, stating "I don't think I need any medication for something that is a nuisance to anybody who experiencing it because it's just a diagnosis. It's not a fair diagnosis.") The court was particularly "concerned that [D.B.] has not yet acknowledged the affliction that he has and doesn't feel that he needs to take medication on a continuous basis. And that's part of the issue that the Court is looking at in [D.B.'s] case."

In sum, even assuming the court erred in admitting any of the challenged portions of the medical records, which it did not, any error was not prejudicial.[10]

---

[10] We take this opportunity to express our concern, as have other courts, about the frequency with which conservatorship appeals have become moot due to record preparation and briefing extensions, as was nearly the case with this appeal. Pursuant to section 5361, subdivision (a), a conservatorship "shall automatically terminate one year after the appointment of the conservator by the superior court," and when a challenged conservatorship has ended, the appeal of that conservatorship is rendered moot. (See *Conservatorship of K.P.* (2021) 11 Cal.5th 695, 705, fn. 3.) Accordingly, D.B.'s conservatorship will end on February 17, 2023. Yet this appeal has only just been fully briefed and was assigned to this Court on January 12. Although D.B. promptly filed a notice of appeal, the court reporter was given three extensions of time (totaling approximately three months) to prepare the record and respondent received a 22-day extension to file its brief. While there may well have been good cause for these extensions, they nevertheless contributed significantly to this appeal nearly becoming moot. Appellant, in turn, could have asked that the appeal be expedited or for calendar preference, but did not. (See *Conservatorship of Forsythe* (1987) 192 Cal.App.3d 1406, 1409 [adopting policy to entertain such cases on "expedited appeal"]; Cal. Rules of Court, rule 8.240 [motion for calendar preference].) It is also incumbent on the superior court to consider measures to address the recurring delay in the production of a complete record that too often precludes review in these cases.

**DISPOSITION**

The conservatorship order is AFFIRMED.

_____

Banke, J.


We concur:


_____

Humes, P.J.


_____

Margulies, J.


A164706, *Public Guardian Contra Costa v. DB*